ELBERT W. SHIRK

*v.*

THE CITY OF CHICAGO *et al.*

*Opinion filed February 21, 1902—Rehearing denied April 4, 1902.*

1. MUNICIPAL CORPORATIONS—*Statute of Limitations does not run against municipal corporation.* The Statute of Limitations does not run against a municipal corporation in respect to property held for public use, and hence mere possession by a person of a portion of a public street, however long continued, avails nothing.

2. SAME—*evidence of abandonment of street by city must be clear.* In order to show an abandonment by a city of a portion of a public street there must be not only an apparent abandonment by the public, but an intention to abandon must also be proven by clear and satisfactory evidence.

3. SAME—*what necessary to create equitable estoppel against city.* To give rise to an equitable estoppel against the right of a city to assert ownership of a portion of a public street in possession of a private party, it must appear that he has been induced by the acts of those representing the public to believe such portion of the street had been abandoned, and that he has erected structures thereon of such a character that it would entail great pecuniary loss to him to permit the city to assert its right of possession.

4. SAME—*no equitable estoppel can be based upon a temporary permissive use.* If a property owner, by the consent of the city, fences in a portion of a public street for a grass plot, upon the understanding that he will surrender possession of the same upon request, neither he nor his grantees can claim an equitable estoppel against the right of the city to recover possession.

APPEAL from the Superior Court of Cook county; the Hon. PHILIP STEIN, Judge, presiding.

This is a bill, filed by the appellant on October 21, 1897, and amended on May 16, 1901, against the appellees, the city of Chicago and the South Park Commissioners, to remove certain alleged clouds upon the title to a strip of land thirty feet wide on the east side of Michigan avenue, running from the south line of Park row to the north line of Twelfth street, and to enjoin the city and park commissioners from asserting any right, title, or interest, in or to said strip, or from interfering with appellant's possession thereof. Answers were filed by the city and the park commissioners denying the material allegations of the bill, to which answers replications were filed. Upon hearing had upon oral, written and documentary evidence, the trial court held that appellant had no title, right, claim or interest, whatsoever, in or to said thirty-foot strip, or any part thereof, and found that the equities were with appellee, the city of Chicago, and decreed that appellant's bill should be dismissed for want of equity at the cost of appellant. The present appeal is prosecuted from the decree so entered.

On February 11, 1835, the legislature of Illinois passed "An act to change the corporate powers of the town of Chicago," section 2 of which provided "that all that district of country contained in sections 9 and 16, north and south fractional sections 10, and fractional section 15, in township 39 north, of range 14 east of the third principal meridian, is hereby declared to be within the boundaries of the town of Chicago: *Provided*, that the authority of the board of trustees of the said town of Chicago shall not extend over the south fractional section 10 until the same shall cease to be occupied by the United States." (Laws of 1835, p. 204).

On January 9, 1836, the legislature of Illinois passed "An act for the construction of the Illinois and Michigan

canal," wherein, in section 32 thereof, it was provided
that "the commissioners shall examine the whole canal
route, and select such places thereon as may be eligible
for town sites, and cause the same to be laid off into
town lots, and they shall cause the canal lands in or
near Chicago, suitable therefor, to be laid off into town
lots;" and wherein, in section 33, it was further provided
as follows: "And the said board of canal commissioners
shall on the twentieth day of June next, proceed to sell
the lots in the town of Chicago and such part of the lots
in the town of Ottawa, as also fractional section 15, ad-
joining the town of Chicago, it being first laid off and
subdivided into town lots, streets, and alleys, as in their
best judgment will best promote the interest of the said
canal fund." (Laws of 1836, p. 150; *Illinois Central Rail-
road Co.* v. *Illinois*, 146 U. S. 396).

On June 13, 1836, a plat of said fractional section 15
in township 39, range 14, was made by the canal com-
missioners and recorded in the recorder's office of Cook
county on July 20, 1836. Upon said plat said fractional
section 15 was divided into twenty-three blocks, twenty-
two being west of Michigan avenue, and one, viz., block
23, being east of and adjoining Michigan avenue; block 23
was subdivided thereon into six lots running from north
to south from the north line of said block to Twelfth
street, and numbered from west to east, lot 1 being shown
as two hundred feet in length from north to south along
the east side of Michigan avenue from the north line of
the block to Twelfth street, Michigan avenue along all
of lot 1 being shown as one hundred and twenty feet in
width. A copy of this plat, with the exception that the
width of Michigan avenue between block 23 and lots 9,
12 and 13 of block 21, being one hundred and twenty feet,
is not designated thereon, may be found on page 397 in
*Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 397. The
southern part of the plat, so far as it is necessary to re-
fer to the same for the purposes of this case, is as follows:

On March 4, 1837, the legislature of Illinois passed "An act to incorporate the city of Chicago," by the first section of which it was provided: "That the district of country in the county of Cook in the State aforesaid, known as  *  *  *  fractional section 15, section 16, section 17, section 20, section 21 and fractional section 22, in township 39 north, range No. 14 east of the third principal meridian, in the State aforesaid, shall hereafter be known by the name of the city of Chicago;" and by the 61st section of which act it was provided that "all the estate real and personal, vested in or belonging to or held in trust by the trustees of the town of Chicago at the time this act shall take effect as a law, shall be and is hereby declared to be vested in the city of Chicago," etc. (Laws of 1836-37, pp. 50, 74; *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 462).

On February 21, 1848, a patent, which was subsequently recorded in the recorder's office of Cook county on August 22, 1849, was issued by the State of Illinois to William H. Brown, conveying to him lots 1, 2, 3, 4, 5 and 6 in block 23 in fractional section 15 addition to Chicago. By quit-claim deed dated June 23, 1848, and recorded August 22, 1849, William H. Brown and wife con-

veyed said last named six lots to Joseph Johnston. By warranty deed dated October 4, 1853, and recorded October 6, 1853, Joseph Johnston and wife conveyed to Mathew Laflin land described as follows: "Commencing at the north-west corner of said block 23 and running thence east along the north line thereof fifty feet; thence south on a line parallel with Michigan avenue one hundred and twenty-five feet to the north line of an alley fifteen feet wide running east and west through said block to the Illinois Central Railroad Company's line, said alley to be for the sole use and benefit of the owners of lots in said block for the distance it runs; thence west on a line parallel with the north line of said block fifty feet to the east line of Michigan avenue; thence north along said east line one hundred and twenty-five feet, to the place of beginning."

A plat entitled "The plat of Johnston & Laflin's subdivision of lots 1, 2, 3 and part of 4 in said block 23," was made on December 20, 1854, and recorded on January 20, 1855, which said plat is as follows:

By warranty deed dated August 1, 1857, recorded November 11, 1857, Mathew Laflin and wife conveyed to Charles G. Wicker "same premises as in deed from Johnston to Laflin." By warranty deed dated February 13, 1875, recorded February 13, 1875, Charles G. Wicker and wife conveyed to Sidney W. Sea lots 9 and 10 in said subdivision of Johnston & Laflin; and by quit-claim deed dated March 6, 1875, and recorded April 3, 1875, Wicker and wife conveyed to said Sea "all interest in lot and premises, with the house thereon heretofore occupied and used by the first party as a homestead, being the premises mentioned in the deed of first party to second party, bearing date February 13, 1875, * * * together with all other lands enclosed with the same, if any, being the lands now enclosed by the fence surrounding said house." By warranty deed dated August 26, 1875, and recorded August 26, 1875, Sidney W. Sea and wife conveyed to Elliott Anthony lots 9 and 10 of said Johnston & Laflin's subdivision and "all right, title and interest which they may have in any way in all the lands lying adjacent to said premises above described on the north and west side of said premises, and which are now enclosed with the above described premises by a fence, being the same premises conveyed by Charles G. Wicker and Elizabeth, his wife, to said Sidney W. Sea, by quit-claim deed, dated March 6, 1875," etc. By quit-claim deed dated June 25, 1881, recorded July 1, 1881, Elliott Anthony, widower, conveyed to Benjamin F. Norris all interest in lots 9 and 10 of the same subdivision; "also all the lands lying adjacent to said premises above described on the north and west side of said premises and which are now enclosed with the above described premises with a fence, being the same premises conveyed by" Wicker and wife to Sea March 6, 1875. By warranty deed dated March 27, 1886, and recorded April 16, 1886, Benjamin F. Norris and wife conveyed to E. W. Shirk sub-lots 9 and 10 of the same subdivision; and by quit-claim deed dated March

27, 1886, and recorded April 16, 1886, the same grantors conveyed to the same grantee "all interest in the following described real estate, to-wit: All those pieces or parcels of land on the north and west side of lots 9 and 10 of Joseph Johnston's subdivision of lots 1, 2, 3 and part of 4, block 23, fractional section 15 addition to Chicago, and which are now enclosed with the above described premises with a fence, being the same premises conveyed by" Wicker and wife to Sea March 6, 1875, and by Sea to Anthony, August 26, 1875.

By quit-claim deed dated July 2, 1859, and recorded August 2, 1859, Joseph Johnston and wife conveyed to Sylvester Lind, with other property in the same block, lots 11 and 12 in Johnston & Laflin's subdivision aforesaid. By mortgage dated September 15, 1859, and recorded on the same day, Sylvester Lind and wife mortgaged said lots 11 and 12, and other lots in the same block, to the Connecticut Mutual Life Insurance Company. This mortgage was foreclosed, and by master's deed dated June 11, 1864, and recorded June 15, 1864, Hiram F. Mather, master in chancery, conveyed to the Connecticut Mutual Life Insurance Company said lots 11 and 12. By quit-claim deed dated June 13, 1864, and recorded June 15, 1864, the Connecticut Mutual Life Insurance Company conveyed said lots 11 and 12 to Memoir V. Hotchkiss. By quit-claim deed dated June 13, 1866, and recorded November 10, 1866, Memoir V. Hotchkiss and wife conveyed said lots 11 and 12 to H. Frederick Temple and James B. Johnston. By quit-claim deed dated September 1, 1869, and recorded February 15, 1870, H. Frederick Temple and wife and James B. Johnston and wife conveyed said lots 11 and 12 to Eliza A. J. Temple, wife of John F. Temple. By warranty deed dated March 20, 1886, and recorded April 29, 1886, Eliza A. J. Temple and husband conveyed said lots 11 and 12 to the appellant Elbert W. Shirk.

By warranty deed dated November 9, 1892, and recorded November 10, 1892, Elbert W. Shirk and wife con-

veyed lots 9, 10, 11 and 12 in Johnston & Laflin's subdivision aforesaid to Ira Holmes and Charles W. Rigdon. By quit-claim deed dated November 9, 1892, and recorded November 10, 1892, Shirk and wife conveyed to Holmes and Rigdon "all interest in that piece of land thirty feet wide on the west side of and adjoining lots 10, 11 and 12, in Johnston & Laflin's subdivision aforesaid, and also in the vacated alley lying between lots 7, 8, 9 and 10, in block 23, fractional section 15, on the one hand, and lots 11 and 12 aforesaid on the other." By trust deed dated November 9, 1892, and recorded November 10, 1892, Ira Holmes and Charles W. Rigdon conveyed to Frederick Ullmann, as trustee, said lots 9, 10, 11 and 12, and also "all interest said parties of the first part now have or may hereafter acquire in or to that piece of land thirty feet wide on the west side of and adjoining said lots 10, 11 and 12, and also in the vacated alley lying between said lots 7, 8, 9 and 10 on the one hand and lots 11 and 12 aforesaid on the other," to secure their note of even date therewith for $290,000.00 payable to the order of Elbert W. Shirk on or before one year after date. By quit-claim deed dated December 13, 1892, and recorded March 23, 1893, Ira Holmes and wife and Charles W. Rigdon, widower, conveyed to the city of Chicago the following property: "Commencing at the north-west corner of lot 10 in Johnston & Laflin's said subdivision; thence south to the south-west corner of lot 12 in Johnston & Laflin's subdivision aforesaid; thence west along the north line of Twelfth street to the east line of Michigan avenue boulevard; thence north along the east line of said boulevard to the south line of Park place or Park row; thence east along the south line of said Park place or Park row to the place of beginning; meaning and intending hereby to convey all the right, title and interest of the grantors herein to a strip of land thirty feet in width from east to west which lies next west of and adjoining said lots 10, 11 and 12 in Johnston & Laflin's subdivision aforesaid,

195—20

and west of the west line of said lots 10, 11 and 12 as extended across a vacated alley which lies between said lots 10 and 11. This deed is made to perfect the title to the above property in the city of Chicago as a portion of Michigan avenue as originally dedicated."

By a proceeding brought by the appellant Shirk on November 16, 1893, in the superior court of Cook county to foreclose said trust deed from Holmes and Rigdon to Ullmann, trustee, wherein Holmes, Rigdon and the city of Chicago were parties and were duly served with process and filed their answers, a decree of foreclosure was entered on June 23, 1894, cutting off the rights of the defendants thereto in and to the property described in said trust deed, but containing the following provision, to-wit: "No rights or interest in said property which are claimed by the defendant, the city of Chicago, shall be barred or in any way affected by this decree, except the right, if any, which said city claims to have derived in and to said strip of land thirty feet wide under and by virtue of a deed executed by said Charles W. Rigdon and said Ira Holmes and Virginia B. Holmes, his wife, to said city of Chicago, bearing date December 13, 1892, and recorded on the 23d day of March, 1893." On December 16, 1895, a master's deed on foreclosure of said trust deed was executed by the master in chancery to the appellant.

ULLMANN & HACKER, for appellant.

GRANVILLE W. BROWNING, (CHARLES M. WALKER, Corporation Counsel, ARTHUR B. WELLS, and HOLLETT, TINSMAN & SAUTER, of counsel,) for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

Michigan avenue in the city of Chicago, as originally laid out between lot 1 in block 23 of the canal commissioners' subdivision of fractional section 15, town 39,

range 14, on the east, and lots 9, 12 and 13 of block 21 on the west was one hundred and twenty feet wide, as shown by said plat and the plat subsequently made of Johnston & Laflin's subdivision. In other words, Michigan avenue between Park row on the north and Twelfth street on the south, was originally laid out as a street one hundred and twenty feet wide. Appellant claims to be the owner of the east thirty feet of Michigan avenue as thus originally laid out, that is to say, of a strip of land thirty feet in width from east to west, which lies next west of and adjoining lots 10, 11 and 12 in Johnston & Laflin's subdivision, said strip thirty feet wide running from Park row on the north to Twelfth street on the south. On the other hand, the city of Chicago claims that said strip, thirty feet wide, is still a part of Michigan avenue, and is owned by the city subject to such control over the same, or such interest in the same, as may have been heretofore granted by the city to the South Park Commissioners. The question, therefore, to be decided, is whether the strip in question belongs to appellant, or to the city of Chicago.

Appellant does not claim to have any paramount or government title to the strip in question. Whatever interest he has in the strip he bases upon adverse possession in his grantors and himself for a long period of years, and upon an alleged estoppel and abandonment on the part of the city.

The record shows, that Charles G. Wicker was the owner of lots 9 and 10 in Johnston & Laflin's subdivision from August 1, 1857, to February 13, 1875, a period of about eighteen years. In 1858 or 1859 Wicker built a brick house upon lot 10, fronting north on Park row and running back on the east line of Michigan avenue. The west side of this house was built on a line with the west side of lot 10, which was the east side of the thirty-foot strip in question. After the house was constructed, it appears that the eaves thereof projected a short distance

over upon the strip in question, and that a bay window in the second story of the house, and some eight or ten feet above the ground, projected a short distance over the strip. It also appears that, about the time when Wicker finished his house, or shortly thereafter, he fenced in that portion of the strip lying on the west side of his house as a grass plot. The fence, enclosing the grass plot, was originally a wooden fence, and many years afterwards an iron fence upon a stone coping was substituted for the wooden fence. The house built by Wicker is still standing. The fence remained around the grass plot until 1892, when, about the time of the execution of the quit-claim deed executed by the appellant to Holmes and Rigdon conveying the strip, the city of Chicago, through its officers and employes, tore the fence down. After the foreclosure of the trust deed executed by Holmes & Rigdon to Ullmann for use of the appellant, the fence was re-built by the appellant. The projection of the eaves and of the bay window of the house, built by Wicker, still exists as when the house was originally constructed. The only possession, relied upon by the appellant as to that part of the strip lying west of lot 10, is the enclosure of the same by the fence originally built by Wicker, and the projection of the eaves and bay window over the same.

In 1852 Joseph Johnston built a house on what was subsequently lot 12, at the south-west corner of the original lot 1 of block 23, being the north-east corner of Michigan avenue and Twelfth street. Johnston, after he built his house, enclosed that part of the strip in front of him and made a grass plot of it. The porch and steps of his house projected over and into the thirty-foot strip, the western side of his house being on a line with the eastern edge of the strip, and the eastern edge of Michigan avenue. In 1869 Mrs. Eliza A. J. Temple, being the owner of lot 11, built a house thereon fronting upon the strip, whose steps and eaves projected over and into the strip.

The portion of the strip in front of her house was also enclosed by a fence and made into a grass plot. Mrs. Temple's house was also built upon the east line of the strip in question, or of Michigan avenue as a street one hundred and twenty feet wide. The enclosure of the strip in front of lots 11 and 12, and the projection of the porch and of the steps of the houses built upon lots 11 and 12, are the acts of possession relied upon by the appellant, so far as that portion of the strip which lies west of lots 11 and 12 is concerned. Great stress is laid by appellant's counsel upon the long period of time, during which these enclosures and projections existed, such period of time having been somewhere in the neighborhood of thirty-five or forty years.

Leaving, for the present, the question of appellant's alleged title to, or interest in, the strip, we will consider appellant's contention in reference to the title to, or interest therein, of the city of Chicago. It is not denied on the part of the appellant, that Michigan avenue between Park row and Twelfth street was originally laid out as a street one hundred and twenty feet wide. It is claimed, however, that, although such width was designated upon the plat made by the canal commissioners on June 13, 1836, yet the dedication of the street as a street one hundred and twenty feet wide, made by the acknowledging and recording of that plat, was never accepted by the city of Chicago. No objection is made, as we understand it, to the original plat of 1836. It is not contended that that plat was not made in strict accordance with the statutes upon the subject, as they then existed. It was a legal, statutory plat. If, therefore, the dedication of Michigan avenue, as a street one hundred and twenty feet wide, was accepted by the city of Chicago, the title to the street vested in the city in trust for the use of the public. The evidence in the record shows quite satisfactorily, that there was an acceptance of the offer of dedication by the city.

It will be impossible, and it is not necessary, to comment upon all the evidence relating to the subject of acceptance by the city. It is sufficient to set forth a few of the circumstances which indicate such acceptance. It is not altogether clear, that there had not been an acceptance of the dedication of this street by the town of Chicago before the incorporation of the city of Chicago. If there had been such acceptance by the town, then the fee of the street vested in the town by virtue of the plat and of the acceptance; and, such being the fact, under the act incorporating the city of Chicago passed in 1837, the title to the street, as theretofore held in trust by the trustees of the town of Chicago, vested in the city of Chicago. (*Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 396).

Even, however, if there was no acceptance of the offer of dedication by the town of Chicago, the city of Chicago, after its incorporation, took such action in reference to the street, as clearly establishes an acceptance of the dedication thereof. On April 29, 1844, the common council of the city of Chicago passed the following resolution:

"*Resolved,* That all that part of Michigan avenue which lies east of a line ninety feet east of the east line of a tier of lots on section 15, fronting said avenue on the east, shall be enclosed as a public park, and all that part of said avenue in Fort Dearborn addition, which lies east of a line drawn due south from the south-west corner of the lot, belonging to the estate of John Wright and occupied by Mr. Lamb, shall be enclosed in a public park at the expense of the subscribers to such enclosure."

It is admitted that the lot, referred to as belonging to the estate of John Wright, was at the north-east corner of Randolph street and Michigan avenue. The strip in question lies east of a line ninety feet east of the east line of lots 9, 12 and 13 of block 21 in section 15, which front Michigan avenue on the east. Therefore, the strip here in controversy is. included within the language of the first clause of the resolution of April 29, 1844, and, by direction of the common council, was enclosed as a

park. It was not necessary, that all of the street should be improved as a roadway. The common council had the right and power to set apart a portion of it as a park, or to be used for grass plots as a beautification of the highway. The ordinance of 1844 expressly recognizes the fact, that Michigan avenue is more than ninety feet wide by providing that the portion of it east of the ninety feet shall be enclosed for a special purpose. By that resolution the city assumed the authority to determine what portion of the street should be used for a roadway, and what portion thereof should be used for the purposes of a public park. The assumption of authority, thus exercised by the city through its common council, is affirmative evidence of an acceptance by the city of the dedication of the street as a street one hundred and twenty feet wide.

In addition to the resolution of April 29, 1844, the record shows other resolutions, passed by the city council in 1844 and in subsequent years, directing the street commissioner of the city to proceed in the work of protecting the lake shore of fractional section 15 from the action of the waters of Lake Michigan. Resolutions were passed, authorizing the borrowing of money to pay for such work of protecting the street. On July 5, 1845, a resolution was adopted by the common council, appointing five freeholders residing in the city to take action with reference to the protection of Michigan avenue from the encroachments of the lake. These resolutions show, that the city assumed control over the street and regarded itself as the owner thereof. We are of the opinion that there was an acceptance by the city of Chicago of the dedication of Michigan avenue as a street one hundred and twenty feet wide, including the thirty-foot strip herein controversy, and that, therefore, the fee of the street one hundred and twenty feet wide between Park row and Twelfth street vested in the city of Chicago in trust for the public.

It being established, then, that the city of Chicago was the owner of the fee of Michigan avenue, including the strip in question, no rights in the strip as a part of the street could accrue to the appellant, or any of his grantors, by reason of any possession of the strip, no matter how long continued.

In *Lee* v. *Town of Mound Station*, 118 Ill. 304, we said (p. 316): "Assuming that there was a statutory dedication, and an acceptance by the public, the title to the property was vested in the corporation *in trust* for public use. The corporation held it in its governmental capacity only, and could therefore invest private parties with no rights in it inconsistent with the public use, and the Statute of Limitations would not, therefore, run in favor of a private party, to bar the rights of the public." The title to Michigan avenue as a street one hundred and twenty feet wide, including the thirty-foot strip here in question, was vested in the city in its governmental capacity to hold for the use of the public, and, therefore, the Statute of Limitations could not run in favor of appellant, or any of his grantors, to bar the rights of the public.

It has always been the doctrine of this court, that the Statute of Limitations does not run against a municipal corporation in respect to property held for public use. (*County of Piatt* v. *Goodell*, 97 Ill. 84; *Lee* v. *Town of Mound Station, supra; Greenwood* v. *Town of LaSalle*, 137 Ill. 225; *City of Joliet* v. *Werner*, 166 id. 34; *Jordan* v. *City of Chenoa*, id. 530; *City of Sullivan* v. *Tichenor*, 179 id. 97; *Village of Itasca* v. *Schroeder*, 182 id. 192).

In *Jordan* v. *City of Chenoa, supra*, we said (p. 536): "Where streets and alleys have been dedicated and accepted they are held by the municipality in its public capacity. They are held in trust for the benefit of the general public, and, when so held, the Statute of Limitations will not run in favor of a private individual to bar the rights of the public." In *City of Sullivan* v. *Tiche-*

*nor, supra,* we said (p. 101): "Municipal authorities cannot grant a street for any purpose inconsistent with the public use, and as prescription presupposes a grant, it can not exist in such a case, and an individual cannot acquire a prescriptive right for any private use. * * * If complainant could gain no right by prescription or under the Statute of Limitations, to say that mere possession for any length of time could invest her with right or title to the premises would be to give her the benefit of the Statute of Limitations under some other name." In the recent case of *City of DeKalb* v. *Luney,* 193 Ill. 185, the same doctrine has been again announced in the following words (p. 189): "Adverse possession of a portion of the street by the appellee and those in the line of his title or possession, no matter how long continued, had no effect, by reason of the provisions of the Statute of Limitations, to bar the right of the city to be restored to possession of the street to the full width thereof. The title to the street is vested in the city in its governmental capacity, to hold for the use of the public, and the Statute of Limitations does not run in favor of appellee to bar the right of the public." So far, then, as the claimed title of the appellant is based upon long continued possession in himself and his grantors, it cannot avail as against the rights of the city.

While substantially conceding, that possession alone is not sufficient to give title to the strip, appellant contends that, in addition to the possession referred to, the city is barred by acts of estoppel and abandonment from insisting upon any interest in the strip, even if such interest was originally vested in it. So far as the matter of abandonment is concerned, it is well settled in such cases that there must not only be an apparent abandonment by the public, but an intention to abandon must be established by the evidence; and such intention must be clearly and satisfactorily proved. (*Town of Lewiston* v. *Proctor,* 27 Ill. 414; Elliott on Roads and Bridges, sec. 972;

*Horey* v. *Village of Haverstraw*, 124 N. Y. 275.)    There is no evidence in this record, tending to show an intention on the part of the public to abandon the strip in question. As was said by this court in the recent case of *City of DeKalb* v. *Luney, supra:* "Nor could any act or acts of abandonment of the street by those in authority in the governing body of the city, no matter though expressly made and declared, operate to create the estoppel, for it is not within the lawful exercise of the power of such authorities to abandon the streets which they hold for the use of the public, so that by the mere act of abandonment rights of the public therein may be lost."

It is true, that the doctrine of estoppel has been held by this court to be applicable, under certain circumstances, to a municipal corporation, but "only as a means of preventing injustice or fraudulent results, where the acts of the municipality have induced a change of conduct in the complaining party." (*City of Chicago* v. *Sawyer*, 166 Ill. 290; *Lee* v. *Town of Mound Station*, 118 id. 304). The holding of the court upon this subject is well stated in the case of *Lee* v. *Town of Mound Station, supra*, where it is said (p. 317): "It is true, that we have held that where the public have long withheld the assertion of control over streets, and private parties have been, by the acts of those representing the public, induced to believe the streets abandoned by the public, and on the faith of that belief, and with the acquiescence of those representing the public, they have placed themselves, by making structures or improvements in the street, in a situation where they must suffer great pecuniary loss, if those representing the public be allowed afterwards to allege that the street was not abandoned, the doctrine of equitable estoppel may be applied." In order to create an equitable estoppel against the city or the public in cases like the case at bar, something more than mere possession of a street on the part of private parties must be shown. In addition to possession, it must appear that such pri-

vate party has erected structures or improvements on the street of such character, that it would entail pecuniary loss upon the private property owner, in case the public should assert its right to re-possess itself of the premises. An examination of most of the cases, referred to by counsel for appellant, will show that, in addition to possession, there was this fact of improvement by the erection of permanent structures. (*City of Joliet* v. *Werner*, 166 Ill. 34; *Jordan* v. *City of Chenoa*, id. 530; *Village of Itasca* v. *Schroeder*, 182 id. 192; *City of DeKalb* v. *Luney, supra*).

In *City of Chicago* v. *Sawyer*, 166 Ill. 290, we said (p. 297): "As between individuals, if one by words or conduct willfully causes another to believe the existence of a certain state of things, and induces him to act upon it so as to change his previous condition, such person will be estopped to deny the truth of his representation. While this doctrine of equitable estoppel will be applied in proper cases to a municipal corporation where it represents public rights and interests, the municipality will be estopped or not, in respect to such public right or interest, as justice and right may require. Such an estoppel can only be set up as a means of preventing injustice, where there has been a change of conduct induced by the act of the municipal corporation, and as a means of preventing a fraudulent result."

In *City of Sullivan* v. *Tichenor*, 179 Ill. 97, we said (p. 101): "In all the cases to which we have been referred, as sustaining the right of one who has trespassed upon a public street to retain the premises so taken, there has been some other element than the mere fact of possession, and the conditions have been such that it was necessary to estop the municipality to prevent injustice and wrong. The doctrine of equitable estoppel may be applied to municipal corporations where justice and right may require it. * * * A municipal corporation can no more profit by fraud upon property owners than an individual, and may be estopped by conduct. * * * There are

other cases to the same effect where parties had changed their position relying upon some act or conduct of the municipality."

Applying the doctrine of these cases to the facts, shown by the record in the case at bar, we are unable to see that any estoppel properly arises against the city of Chicago in reference to the strip in question. The testimony shows, that the possession of the strip by private parties through enclosures by fences was by the permission and with the consent of the city for a temporary purpose. As has already been stated, Joseph Johnston built a house on lot 12 in 1852. Charles J. Wicker built a house on lot 10 in 1859, and Mrs. Temple, the daughter of Joseph Johnston, built a house on lot 11 in 1869. Inasmuch as all these parties had a mere permissive possession of the strip in question, and, while holding such possession, recognized the city as the owner of the strip, it cannot be said that they were induced by any conduct on the part of the city to build out the eaves or porches or steps of their houses into the strip. If any conduct of the city had induced them to believe that the strip had been abandoned, a different question might arise. But, here, they took possession of the strip under an arrangement or agreement with the city, by the terms of which they were to surrender possession at any time when the interests of the public demanded such surrender. This being so, it cannot be said that they made any improvements, or erected any structures upon any part of the strip, in the belief that the strip had been abandoned by the public. It cannot be said, therefore, that any change of conduct on their part has been induced by any act of the municipality, so that an assertion of right on the part of the municipality would work any injustice or fraudulent results to them. Whatever they did in the way of improvements was done with the knowledge, that the city claimed title to the strip, and would assert that title whenever it should deem it necessary to do so.

Mrs. Temple was twenty-three years old when her father, Joseph Johnston, built his house on lot 12. She lived there with him in that house. She became the owner of lots 11 and 12 in 1869, and, in that year, built a house upon lot 11. She says that she had knowledge of the thirty-foot strip from the time that her father built his house in 1852; that he had no title to the strip; that she knew when the house was built that Michigan avenue, as platted, was one hundred and twenty feet wide; that there was an arrangement between the city authorities and the owners of the property, "by which the thirty-foot strip was to be enclosed by permission of the city until such time, if ever, that the public wanted to use it;" that she heard her father speak of such arrangement; that the arrangement was, "that he should have the use of the strip, and his object was simply to keep the place in decent order—to keep it nice and clean, instead of having it a waste of sand—a thoroughfare." Fernando Jones testifies, that about 1859 he was a member of the common council, and that he and a Mr. Cleveland, who was then commissioner of the board of public works, went to see Mr. Wicker and Mr. Johnston with reference to the strip in question and had a talk with them about it; that they were acting in the interest of the city, and that he and Mr. Cleveland made an arrangement with Mr. Wicker and Mr. Johnston, and some others, that they would be allowed to fill up the strip with black soil, and sow seed and lay sod on it, so as to make a grass plot of it; that it was understood between Jones and Cleveland, acting for the city, and Wicker and Johnston and other property owners acting for themselves, that the fence should be taken away from the strip at any time when the city should require it to be done. Mr. C. C. P. Holden also testifies, that in 1865 or 1866 he was a member of the common council at the same time when Wicker was a member of the council, and that Wicker said at that time, "that he was ready at any time to yield up anything that

the city might ask in the way of abandoning it;" that
Wicker then stated, that he simply desired to fence it in
and make a grass plot of it, or a playground for the chil-
dren, and would surrender the possession whenever the
interests of the public required.   The testimony of Mrs.
Temple, and of Jones, and of Holden upon this subject
is not contradicted by any testimony in the record pro-
duced by the appellant.   The fact, that the original pos-
session of these parties was merely permissive, and not
adverse, is immaterial for the purpose of showing that
the possession was not adverse, because, as against the
city, it made no difference whether the possession was
adverse or not, but the permissive character of the origi-
nal possession is important upon the question of estop-
pel, as showing that the city was guilty of no conduct,
which induced these parties to believe, that it intended
to release or surrender or abandon its right to the strip
in question.

The testimony of the witnesses is confirmed by the
conduct of the original owners of the property in ques-
tion.   For some years prior to 1852 Joseph Johnston
owned the whole of block 23, and lived on the block, and
had a soap factory upon the same, which was erected in
the middle of the block.   Jones says, that Joseph John-
ston lived upon these premises seven or eight years be-
fore the house was built by him in 1852.   The original
patent, issued by the State to William H. Brown, was
issued to Brown as assignee of Joseph Johnston, which
would go to show that the six lots in block 23 had been
bought by Johnston at the canal sale some years before
1848.   Johnston knew, that Michigan avenue was one hun-
dred and twenty feet wide, as laid out upon the original
plat made by the canal commissioners, and also knew of
the ordinance of the city passed in 1844, providing that
all of Michigan avenue east of the west ninety feet there-
of should be laid out as a public park, and not as a road-
way.   No conveyance of the thirty-foot strip, lying west

of lots 11 and 12, was made by any of the parties holding title from 1848 down to 1892.

In 1853 Joseph Johnston conveyed what was afterwards lots 9 and 10 of Johnston & Laflin's subdivision to Mathew Laflin, describing the property by metes and bounds, so that the western side thereof was the eastern line of Michigan avenue as a street one hundred and twenty feet wide. In other words, the conveyance by Johnston to Laflin did not include any part of the thirty-foot strip, lying just west of the premises conveyed. If Johnston had been induced to believe that the city had abandoned the thirty-foot strip, it is singular that he did not embrace the strip in the deed to Laflin. That deed was made a year after he had erected his house, and projected the porch and the steps into the strip in question. Those projections could not have been made by him under the belief that the city had abandoned the strip, or he would have embraced a part of the strip in the conveyance to Laflin. In 1854, two years after Joseph Johnston's house was built, he and Laflin made a subdivision of a part of block 23, in which they made the western lines of lots 10, 11 and 12 front upon Michigan avenue as a street one hundred and twenty feet wide; that is to say, no part of the thirty-foot strip was embraced in the subdivision made by them, but that subdivision recognized Michigan avenue as a street one hundred and twenty feet wide. This would indicate that they did not regard the thirty-foot strip as having been abandoned by the city, but regarded it as still a part of the street. Again, in 1859 Johnston deeded lots 11 and 12 to Sylvester Lind, but deeded them as lots abutting upon a street one hundred and twenty feet wide, conveying no part of the thirty-foot strip in question. Mrs. Temple owned lots 11 and 12 from 1869 to 1886, a period of seventeen years, and, according to her testimony, she recognized the city as the owner of the strip during all this period, and regarded her possession of the lots and the improve-

ments upon them as subordinate to the rights of the city in the strip.

When Mathew Laflin deeded what was afterwards lots 9 and 10 to Charles G. Wicker in 1857, he described the property by metes and bounds as fronting on Michigan avenue as a street one hundred and twenty feet wide, and included in his deed no part of the strip, showing that Mathew Laflin did not regard the strip at that time as having been abandoned by the city, or as belonging to the adjoining lot owners. Wicker owned lots 9 and 10 from 1857 to 1875, a period of eighteen years, and the testimony tends to show that, during all this time he regarded his rights in said strip as subordinate to the rights of the city. It is true that, from 1875 to 1892, he and some of his grantees executed quit-claim deeds of all their interest in that portion of the strip which was enclosed by a fence, but this conveyance transferred nothing more than the mere permissive possession, which Wicker held originally. When appellant became the owner of lots 10, 11 and 12, he asserted ownership in the strip by conveying all three lots to Holmes and Rigdon, including the strip in question. As soon as this assertion of title adverse to the city was made by appellant, the city took possession of the strip. Wicker's house was on the line of the east edge of the strip in question, and was not built upon any portion of the strip. If he built the eaves of his house, and the bay window in the second story thereof, in such a way as to project a short distance over the strip, he was not induced to do so by any conduct of the city, because he well understood that his possession of the strip was merely permissive. It is difficult to understand, however, how any pecuniary loss or sacrifice can accrue to his grantees by reason of the projections in question, as it is perfectly feasible for the city to use the strip without compelling him to remove the projections of the eaves and the bay window.

The record is full of evidence that, for more than ten
years after 1844, the city co-operated with the property
owners themselves in the improvement of Michigan ave-
nue, but which improvement, so far as made by the prop-
erty owners, was in entire subordination to the rights of
the city. Contributions were made by the property own-
ers living on Michigan avenue, as well as by the city,
during these years, for the protection of the land against
the encroachments of the lake. On June 7, 1858, the com-
mon council of the city passed an ordinance, granting
permission to the residents on the west side of Michigan
avenue to lay out courts or parks extending into the ave-
nue twenty-six feet, including the sidewalk. On August
2, 1858, upon the petition of C. G. Wicker and others, the
common council passed an order, directing the super-
intendent to enter into an agreement with the property
owners fronting the south end of Lake Park, granting
them the privilege of improving the street in accordance
with their request, provided that no right the city then
possessed over the street should be forfeited. Jones says
in his testimony, that the arrangement, which he and
Cleveland made with Wicker, was made because the com-
mon council had made no provision by ordinance allow-
ing lot owners on the east side of Michigan avenue to
occupy the area, as had been the case on the west side of
the avenue and north of Park row. In other words, it hav-
ing been the policy of the city at that time to ask the aid
of the property owners in improving the street, the fact,
that the same was improved by the property owners, was
no indication of any abandonment on the part of the city.

It is claimed by counsel for appellant, that the ar-
rangement with the property owners herein referred to
was illegal, and beyond the power of any city official to
make the same. We are inclined to agree with counsel
in the general doctrine, that neither the city, nor any of
its officials, has the power to turn over a public street to

private parties to be used for private purposes. But the
validity of the arrangement in question is not here in-
volved, nor is it necessary to discuss or pass upon the
same. Nothing herein said is to be understood as endors-
ing the validity of such an arrangement; but whether
the arrangement was legal or illegal, the fact, that the
property owners entered into it, was a recognition of the
ownership of the city in the street, and showed that the
property owners were willing to submit to the rights of
the city therein, and that·they were not induced by any
acts or conduct on the part of the city, or its officials,
to make any expenditures, or improvements, the removal
of which would result in injury to them, or in pecuniary
loss by them.

The rights of the city were in no way prejudiced by
the decree entered by the superior court in November,
1893, in the proceeding brought by the appellant to fore-
close the trust deed, executed to Ullmann by Holmes and
Rigdon, because that decree expressly provided, that no
interests of the city were to be affected, except so far
as the quit-claim deed, executed by Holmes and Rigdon,
conveying the strip to the city, was concerned. In other
words, the decree left the rights of the city in the strip
as fixed by the original dedication, and the acceptance
thereof, undisturbed. Holmes and Rigdon, when they
obtained a quit-claim of the strip from the appellant, at
once deeded the strip to the city, and Rigdon, in the sub-
sequent proceeding brought by Hopson, disclaimed any
interest whatever in the strip.

No ordinances were passed by the city prior to the
erection of the house on lot 12 by Joseph Johnston and
of the house on lot 10 by Wicker, which could have in-
duced the erection of the projections, connected with
those houses and extending over the strip. An ordinance
was passed by the city in March, 1859, providing for the
improvement of Michigan avenue between Park row and
Twelfth street to a width of ninety feet. Great reliance

is placed by counsel for appellant upon this ordinance, as showing an intention of the city to abandon the thirty-foot strip, and make Michigan avenue a street only ninety feet wide. The ordinance was merely evidence of the intention of the city to make the roadway and sidewalks a certain width, but did not necessarily indicate any intention to abandon the thirty-foot strip, inasmuch as, by a previous ordinance, that was set apart for purposes of a park, or a series of grass plots. Moreover, the ordinance of March, 1859, was passed after the houses of Johnston and Wicker were built, and, therefore, could not have operated in any way as an estoppel against the city, inasmuch as no reliance could have been placed upon that ordinance as justifying the building of the projections over into the strip.

We see no force in the fact, that the South Park commissioners have taken no steps to improve the strip in question. The ordinance passed by the city was broad enough to turn over the control of Michigan avenue, as a street one hundred and twenty feet wide between Park row and Twelfth street, to the park commissioners. The question here involved is not affected by the fact, that the park commissioners have taken no action in reference to the improvement of the strip.

A proceeding was brought in the circuit court of Cook county in 1892 or 1893 by Joseph Hopson and his wife against the city of Chicago and others, in which a decree was rendered finding the title to the thirty-foot strip here in controversy to be in the city of Chicago, and enjoining the city from attempting to give to any persons any rights in said strip contrary to its duties as a trustee, holding the title in trust for the uses of the public for the purposes of a public street. Counsel for appellant claims, that the court erred in admitting the record of the proceedings in this Hopson suit in evidence. It makes no difference whether there was any error in this respect or not, as the present proceeding is a chancery

proceeding, and there is evidence in the record properly admissible, and properly admitted, which is sufficient to sustain the decree of the court below.

The decree of the superior court of Cook county, dismissing the bill for want of equity at the cost of the appellant, is affirmed.             *Decree affirmed.*